2025 IL App (4th) 241013

NO. 4-24-1013

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 8, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| BRANDON R. WALKER, | ) | |
| Defendant-Appellant. | ) | No. 22CF231 |
| | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Vancil and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1    In April 2022, the State charged defendant, Brandon R. Walker, with six counts of first degree murder (720 ILCS 5/9-1(a)(2) (West 2022)), after his eight-year-old son, N.J., was found naked and starved to death in a bathtub in the family's home in March 2022. At defendant's December 2023 jury trial, the State proceeded on only counts III and VI, and the jury found defendant guilty of both counts. The trial court later sentenced defendant to 100 years in prison on count III and natural life in prison on count VI.

¶ 2    Defendant appeals, arguing that (1) the trial court abused its discretion when it ruled that Stephanie Jones—N.J.'s mother and defendant's codefendant—could invoke her fifth amendment right against self-incrimination and not testify, despite her agreement to testify at

defendant's trial as a condition of her guilty plea; (2) defendant's trial counsel was ineffective because he failed to (a) move for a continuance "to ensure Jones's testimony" would be available and (b) request jury instructions on the lesser-included offense of involuntary manslaughter; and (3) one of defendant's convictions must be vacated under the one-act, one-crime doctrine.

¶ 3    We disagree with defendant's first two arguments but agree with his third. Accordingly, we affirm as modified.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Charges

¶ 6    In April 2022, the State charged defendant with six counts of first degree murder. Count III alleged defendant, "without legal justification, while under a duty to provide care for [N.J.], born on December 7, 2013, withheld medical care and nutrition from [N.J.], knowing said acts created a strong probability of death or great bodily harm to [N.J.] thereby causing the death of [N.J.]"

¶ 7    Count VI alleged the same thing but added, "[N.J.] was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 8    In December 2022, defendant moved to sever his trial from Jones's, which the State intended to pursue simultaneously with defendant's. The trial court granted the motion, finding the trials needed to be severed so that Jones and defendant would not assert fifth amendment rights not to testify against each other.

¶ 9                                    B. Jones's Guilty Plea

¶ 10    In December 2023, Jones pleaded guilty pursuant to a plea agreement, the terms of which included that Jones would (1) plead guilty to one count of first degree murder; (2) be sentenced to between 20 and 100 years in prison and not natural life; (3) serve 100% of that

sentence; (4) waive her appeal, postconviction, and collateral attack rights; and (5) "testify against [defendant] truthfully if [she were] called to testify." Jones acknowledged orally and in writing that these were the terms of the agreement, she agreed to them, and "no promises or threats have been made other than those set out in the agreement stated in open court and that she is entering this agreement voluntarily."

¶ 11        The trial court accepted the guilty plea and set February 7, 2024, as Jones's sentencing date.

¶ 12                      C. Defendant's Jury Trial

¶ 13                  1. *A General Summary of the Trial Evidence*

¶ 14        Since 2017, N.J. had been in the permanent guardianship of Laura Walker, defendant's mother. In July 2021, Laura left N.J. in the care of defendant and Jones while she visited her ailing mother in Florida. Later that month, Laura returned and attempted to retrieve N.J. and his older brother, B.W. However, Jones threatened Laura, and the couple refused to return the children.

¶ 15        In August 2021, defendant, Jones, N.J., and B.W. went to Florida after defendant was hired for a towing job by Tim Behm. During the trip, Thomas Turner, another person hired for the job in Florida and a longtime associate of defendant, witnessed defendant denying N.J. food, telling N.J. he could not have cheeseburgers from the hotel refrigerator because they were for defendant's dog.

¶ 16        In September 2021, Catherine Behm, Tim's wife, drove home to Illinois from Florida with N.J. She testified that N.J. ate well in her care, but photographs admitted at trial showed he was thinner than when he had been living with Laura.

¶ 17 Numerous text messages between defendant and Jones were admitted at trial regarding their abuse of N.J. In September 2021, Jones texted defendant that N.J. had told strangers he was hungry, behavior she intended to punish by withholding meals. Other text messages showed escalating abuse, including tying N.J.'s hands together, forcing him to sleep in the basement, and beating him. Defendant's responses ranged from his stating approval of Jones's proposed punishments to encouraging her to enact more severe punishments. For example, defendant texted "kick his ass" and responded, "Fuck it. Do that shit" when Jones expressed fear she might "really hurt" N.J.

¶ 18 In February 2022, Jones texted defendant about N.J.'s eating food out of the garbage, which she intended to punish by confining him to the basement. She expressed her astonishment to defendant that N.J. asked for a blanket and pillow, to which defendant responded, "He does not care."

¶ 19 Multiple witnesses testified to N.J.'s deteriorating condition. In late October or early November 2021, Tim Behm observed N.J.'s declining condition when he saw him at defendant's house, and he noted that N.J. did "not [look] very good." In January 2022, Turner photographed N.J. looking "very gaunt" and noted he "did not look like the person he saw in Florida." In February 2022, an Illinois Department of Children and Family Services (DCFS) investigator, Kathleen Harvey, found N.J. to be "very thin" with a "gaunt" face and "gray kind of pallor," although she did not believe his condition was "critical." In March 2022, Aaron Winger, defendant's employee, described N.J. as looking "like a cancer patient but he's got hair." A photograph from that month showed N.J. with several facial injuries, sunken eyes, and a receding hairline.

¶ 20 N.J. died on March 29, 2022, weighing only 30 pounds. Dr. Channing Petrak

testified that he was "very, very, thin, emaciated," with "all of his bones *** visible," covered in ligature marks, pressure wounds, and other injuries. The autopsy by Dr. Amanda Youmans opined that N.J. was starved to death.

¶ 21     Evidence found at defendant's home included a note on N.J.'s door instructing B.W. not to give N.J. "any food or drinks," rope on the stairs, and N.J.'s room, which contained only a bed with a pillow but no sheets or blankets. B.W.'s room, however, was filled with toys, games, and snacks. Laura, seeing N.J. after his death, described him as "like a little skeleton sitting there with skin on."

¶ 22                    2. *The Pretrial Proceedings*

¶ 23     On December 5, 2023, defendant filed a motion *in limine*, seeking to limit the admission of text messages sent between him and Jones while N.J. was in their care that would be admitted at trial. Defendant argued that the text messages constituted hearsay unless Jones testified.

¶ 24     On December 11, 2023, defendant filed an addendum to the motion, claiming the admission of text messages to which defendant did not respond was improper without proof that defendant had received them.

¶ 25     Also on December 11, 2023, just before defendant's jury trial began, the trial court conducted a hearing on defendant's motion *in limine*. The State advised the court it (1) would lay a proper foundation for the admission of the text messages between defendant and Jones even if Jones did not testify and (2) was seeking to admit only those text messages to which defendant responded. Defendant replied, "[I'm] not objecting to the ones where [Jones] makes the conversation and [defendant] responds." The court determined, "[W]henever we get to the point in this trial that *** Jones is testifying, if that happens, I'll make my ruling then. And then—then

- 5 -

I will know whether [the] State did what they said they will do, is what I'm trying to say."

¶ 26    Defendant, who had previously asked that a ruling on the admission of Jones's text messages be taken up when "the issue actually rises," did not object to the trial court's delaying its ruling on his motion *in limine*.

¶ 27                        3. *The State's Case*

¶ 28    The State proceeded on a theory that defendant was accountable for Jones's conduct. Evidence in support of that theory included the following.

¶ 29                    a. The Testimony of Laura Walker

¶ 30    Laura Walker, defendant's mother, had been a foster parent for N.J. and B.W. when each boy was an infant. In 2017, she obtained permanent guardianship of both boys.

¶ 31    Laura described N.J. as polite and respectful. She also stated N.J. was healthy, very active, and ate well when he was in her care. Although N.J. suffered from constipation, Laura successfully treated it after taking N.J. to see a specialist in June 2021. At that time, N.J., who was always thin but was following a growth curve, weighed 43 pounds and 10 ounces. She had no concerns with N.J.'s weight at that time. N.J.'s school pictures from kindergarten and first grade, which were admitted at trial, showed that N.J. was tan, his eyes were bright, and he had a full head of hair. Although he was slender, he did not appear to be underweight.

¶ 32    In July 2021, Laura had to go to Florida to see her 95-year-old mother, whose health was failing. She intended to take N.J. with her. However, when N.J. said he wanted to spend time with B.W., whom Laura had allowed to stay with defendant and Jones at their home, Laura decided to let N.J. stay there while she was gone. Laura left N.J. in defendant's care with clothes, toys, schoolbooks, and the over-the-counter medication that N.J. took daily for his constipation.

¶ 33    In late July 2021, Laura returned from Florida and repeatedly contacted both

defendant and Jones to get the boys back. Neither one responded. Then, in mid-August 2021, because school was starting for the boys, Laura went to the home of defendant and Jones to get them back. Jones exited the house and threatened to harm Laura.

¶ 34 Laura returned to her car, called the police, and waited for them to arrive. Defendant, who arrived shortly thereafter, did not speak to Laura. Because the police would not help Laura get the boys back, she went home and called her local police department and DCFS. They, too, were unable to assist Laura.

¶ 35                                      b. The Trip to Florida

¶ 36 Later in August 2021, defendant, who owned his own car repair business and towed cars for other people, went to Florida for a towing job and took Jones, B.W., and N.J. with him. Defendant's employer for this towing job, Tim Behm, and his wife, Catherine Behm, were with them, as well as Thomas Turner, who was also hired to help tow the cars in Florida. The Behms and Turner had known defendant for 20 years or more.

¶ 37 Turner testified that while he was in Florida with the group, he saw N.J. one morning with defendant and B.W. N.J. told defendant he was hungry and asked defendant if he could have one of the cheeseburgers he saw in the refrigerator of the family's hotel room. Defendant told N.J. he could not have one because the cheeseburgers were for defendant's dog.

¶ 38 The Behms drove home from Florida with N.J. around the middle of September 2021. Catherine explained that because N.J.'s clothes were filthy, she had him bathe and gave him a clean shirt to wear. Catherine described N.J. as "very polite" and respectful, and she noted he "ate very well" while in their care. In addition to eating regular meals, N.J. would get snacks when the Behms stopped during the drive.

¶ 39 Catherine took a picture of N.J. surrounded by numerous snacks the Behms bought

for him during the car ride home, and it was admitted at trial. In the picture, N.J. was smiling, but he appeared thinner than he was while in Laura's care. N.J. stayed with the Behms for a few days after they arrived home. N.J. continued to eat well and actively played with the Behms's grandchildren without incident.

¶ 40                    c. The Text Messages Between Defendant and Jones

From Late 2021 to Early 2022

¶ 41          Clinton Rezac, a cybercrime detective, laid the foundation for the proper admission of the text messages mentioned in this opinion.

¶ 42          On September 16, 2021, Jones texted defendant, whom she listed as "Babe" in her contacts, and advised him that N.J. told some people who were driving Tim's tow truck that he was hungry. This enraged Jones. She texted defendant, "[N]ow [N.J.] is gonna know what hungry is!" She said, "I'm not giving him a fucking thing 2day n then tomorrow morning we'll c if asking strangers for anything is a great idea!" Defendant replied, "That is crazy. Did he tell u he was hungry?" Jones responded, "Nope." Defendant texted, "Fucker."

¶ 43          A month later, on October 15, 2021, Jones texted defendant to tell him she found N.J. sleeping at around 10 a.m. This angered Jones, so she made N.J. get up and stand. She texted defendant that she told N.J. "he's n trouble [and] he's not gonna be comfortable!" She then told N.J. he would have to sleep in the basement because he continued to misbehave, a punishment that defendant had already discussed with N.J. Jones texted, "[N.J.] had the nerve 2 look at me n ask if he could at least have his pillow n blanket!" Defendant replied, "He does not care."

¶ 44          On October 18, 2021, Jones texted defendant, advising him that "[N.J.] had been trying real hard 2 get his hands out from being 2gether!" Defendant replied, "Not cool." Jones then assured defendant that N.J.'s hands were not tied too tight, meaning his hands were tied "tight

enough that he couldn't slip his hands out but loose enough he could move his hands!"

¶ 45    On October 21, 2021, Jones texted defendant to tell him N.J. had urinated in his room and when she asked N.J. why, he said he did not want to wake up Jones to have her open the door so he could go to the bathroom. Jones was infuriated and told defendant she did not want to take N.J. anywhere because he acted "weird as fuck!" Jones explained, "He acts like he's bein [*sic*] abused!" Jones, who admitted "whoop[ing N.J.'s] ass maybe a handful of times" and noted "we yell at him," then said, "Trust me, I'd love to beat him!" Jones believed "beating" N.J. would result in him "straighten[ing] up!" Defendant replied, "That would be ok."

¶ 46    In late October or early November 2021, Tim Behm saw N.J. at defendant and Jones's house. Tim was on the porch, and N.J. came outside to say hello. Tim testified that N.J. did "not [look] very good."

¶ 47    On November 27, 2021, Jones texted defendant to tell him, "[N.J.] is already annoying the shit out of me!" She said, "The min[ute] I opened the door [N.J.'s] mouth hasn't stopped n the first thing he asked was about some fucking food!" Defendant assured Jones that N.J. "likes u Babe." After Jones told defendant that she "finally had 2 tell [N.J.] 2 shut up," defendant said, "I love ya Babe." Defendant then asked Jones about expanding their family, texting, "[R]eady to start this baby stuff."

¶ 48    On December 18, 2021, Jones texted defendant, telling him about N.J. whining all day. Defendant first said he "love[d]" Jones and then told her to "kick his ass sea bass." When Jones responded she was "afraid" she was going to "really hurt him," defendant replied, "Fuck it. Do that shit."

¶ 49    On January 3, 2022, Jones texted defendant to tell him she needed to get some sleep while N.J. was home with her. Defendant suggested, "If u lock fridge should be fine." Jones

replied, "Oh no! He'll be into everything else! U already know he loves getting into everything!" Defendant answered, "U might be right." Jones then suggested they make N.J. sleep in the basement or defendant could put N.J. there before he left for work. Jones indicated she would let N.J. out of the basement when she woke up. Defendant replied, "Ether [*sic*] one is ok with me. U cute furry lady."

¶ 50          On January 8, 2022, Jones texted defendant that N.J. had had a dream about Laura regaining custody of him. N.J. had told Jones he wanted to stay with her and defendant in addition to Laura. Jones said, "I called the bs card about him wanting 2 b w us!" Defendant responded, "Ya. I would say so too."

¶ 51          Around January 22, 2022, Turner visited defendant and Jones at their house. While sitting on the couch next to defendant, Turner saw N.J., who had come downstairs. Turner took a picture of N.J., which was admitted at trial. In the picture, N.J. was wearing a hoodie. The only part of N.J.'s body that was visible in the picture was his face. N.J. appeared very gaunt. Turner stated N.J. did not look like the person he saw in Florida, clarifying that N.J. had lost weight and his coloring was different. Turner, who "didn't know *** what was going on," theorized N.J. might have been on some kind of medication.

¶ 52          On February 3, 2022, Jones texted defendant to tell him "some 1 go[t] n the garbage, dug out the leftover [pizza] crust, [and] ate 1/2 of them." She told defendant the last piece of pizza, which she had asked defendant about before she threw it away, was also gone. Defendant replied, "Caught," and he later added, "That is fucking crazy. Eatin out of the trash." Jones replied, "That little fuck ate a whole pizza by himself but yet still dug thru the garbage n took out food." Defendant answered, "I don't understand." Jones texted, "Let's just hope he hasn't been trying 2 eat the garbage downstairs!" Defendant answered, "That would be fucked up."

¶ 53 Jones then said she knew N.J. "wasn't gonna change" and "was gonna do something." She told defendant N.J. would have to stay in the basement, in "that little room w[ith] the paint everywhere!" She also texted that B.W. was in trouble "4 helping [N.J.] open the gate!" Defendant responded, "I told [B.W.] that was bullshit also." Jones asked, "What did he say?" Defendant answered, "He had to go to the bathroom." Jones then commented, "I guess [N.J.] could stay in that room upstairs but the only way this will work is by locking the door from the outside!" Defendant replied, "Yep." Jones then advised defendant, "[N.J. is] staying where he is til u get home! I'm bout to snap on him again n I don't want 2 do that!" Defendant responded, "Ok Babe. No problem." Jones then asserted, "I told u [N.J.] didn't learn a fucking thing!" Defendant commented, "He did not."

¶ 54                              d. The Involvement of DCFS

¶ 55 Later in February 2022, Kathleen Harvey, a child protection specialist with DCFS, was assigned to investigate a hotline report about N.J. and B.W. Harvey scheduled a meeting with defendant and Jones for February 18, 2022, but no one appeared for that meeting. Defendant later told Harvey he forgot about it. Jones texted defendant earlier that day, asking him to "tell DCFS that [N.J.] n I won't be back til Sunday night." Jones continued, "[Harvey has] been nothing but an inconvenience 2 every 1!" Jones then cautioned defendant, "Whatever u say [to Harvey], u need 2 tell what all u tell her!" Jones explained, "We both gotta b on the same page so there's no fuck ups Babe." Defendant responded, "Ok Babe."

¶ 56 Harvey set a new meeting date for February 22, 2022. At that meeting, Harvey walked through the home and talked to defendant, Jones, and N.J. N.J. was wearing a hoodie and lying on the bed in B.W.'s room with a blanket over him, eating popcorn and drinking juice. Harvey testified at trial that "[N.J.] was very thin," his face was gaunt, and he "appeared sickly."

She said his "skin [had] like a gray kind of pallor." Harvey, who did not believe N.J.'s condition was "critical," told defendant her concerns. Defendant told Harvey that N.J. was not gaining weight and said he wanted to take N.J. to the doctor but he did not have guardianship. Harvey then contacted Laura about signing temporary guardianship papers.

¶ 57                                    e. The Testimony of Aaron Winger

¶ 58           Around the beginning of March 2022, Aaron Winger, one of defendant's employees since 2020, was at the home of defendant and Jones. N.J. was there watching television while sitting on a couch with the hood of his sweatshirt pulled up over his head. N.J. waved to Winger, who was familiar with N.J., and Winger testified N.J. "was always really skinny." Winger also testified that N.J. was pale and his face looked "sunk in." Winger later described N.J. as looking "like a cancer patient but he's got hair."

¶ 59           Winger confronted defendant about N.J.'s appearance, and defendant told Winger "[N.J.] had been back and forth to the doctor. And that he was having nutrition problems with his food." Defendant explained that Jones had been taking N.J. to the doctor.

¶ 60           A picture of N.J. from March 11, 2022, was admitted at trial. The picture depicted only N.J.'s face and showed he had a large open wound below his left eyebrow and blood on his left eyelid. He had a bandage between his eyes and underneath his right eye. His eyes appeared sunken, his face was gaunt, and his hairline was receding. Small hairs appeared to be growing on his forehead.

¶ 61                                    f. The Death of N.J.

¶ 62           On the afternoon of Tuesday, March 29, 2022, Jones found N.J. unresponsive in his room. She called defendant and 911.

¶ 63           Shawn Manning, a firefighter and paramedic, was dispatched to the home along

with other first responders. They found N.J. in the bathtub. Manning testified N.J. was extremely malnourished and his skin was cool to the touch. He was not breathing and had no pulse or heart activity. A video recording admitted at trial showed a paramedic carefully carrying N.J., who was emaciated and naked, from the bathroom to the living room for life-saving treatment. Paramedics made various efforts to revive N.J. before deciding to transport him to the hospital for further care.

¶ 64        Dr. Channing Petrak, a pediatrician and expert on child abuse, examined N.J. on March 29, 2022, in the emergency room of St. Francis Hospital. N.J. was barely alive and was "very, very, thin, emaciated," with "all of his bones *** visible." Petrak observed N.J. (1) was unresponsive; (2) had a very slow heart rate; (3) had lost hair on his scalp; (4) had grown lanugo hair, which grows on fetuses to keep the body warm; (5) had sunken eyes; (6) experienced severe muscle wasting throughout his body; and (7) had numerous wounds in various stages of healing, including (a) ligature marks around his wrists, waist, and ankles; (b) bruising on the bridge of his nose caused by blunt force trauma; (c) a gaping open wound just below his left eyebrow; and (d) pressure wounds on his spine, sacrum, and other areas where his bones protruded. N.J. weighed 30 pounds when he died and had lost more than 30% of his body weight in the last eight months.

¶ 65        Given what Petrak observed and saw in N.J.'s medical records, she concluded N.J. suffered from severe malnutrition. Petrak testified that N.J.'s extreme malnutrition was unrelated to his constipation, which she described as "not really" an unusual condition.

¶ 66        Petrak explained that within the 48 hours before N.J. died, he would not have "appeared or acted normally." For example, he would not have been able to stand or walk around. Petrak opined that withholding food from N.J. for a minimum of two to three weeks could have resulted in his death. She testified that if N.J. had intermittent periods of eating, his death may have been delayed.

¶ 67        Officer Clay Blum, a crime scene investigator, took photographs of B.W. and N.J. at the hospital, which were admitted at trial. The photographs showed B.W. was healthy and of average to slightly above average weight. In contrast, N.J. was emaciated. His knees and feet were significantly larger than other parts of his legs, his elbows and shoulders were larger than the upper or lower part of his arms, and his ribs protruded. N.J.'s legs were covered in fine hairs, and N.J.'s body was covered in various wounds.

¶ 68        Laura, who had no contact with defendant, Jones, or the boys from August 17, 2021, to March 29, 2022, saw N.J. after he died. She testified he looked nothing like he did when she left him in defendant's care, describing him as "like a little skeleton laying there with skin on."

¶ 69        Catherine saw a picture of N.J. after he died. She testified that N.J. "d[id not] even look like the same person" she knew in September 2021, describing the picture she saw as "horrifying." Tim, too, saw a picture of N.J. after his death, and he described it as "terrible," noting the picture "[d]idn't look like him." Tim clarified that in September 2021, N.J. weighed more and had more meat on his bones and a fuller face.

¶ 70                g. The Crime Scene Investigation of Defendant's Home

¶ 71        Officer Brittany Martzluf arrived at the house to collect evidence and take photographs. Officer Robert Vasquez walked through the home and made a video recording. The photographs and recording showed the following. The house, though very cluttered, was relatively clean. In the kitchen, there were cans of food, boxes of cereal and snacks, and loaves of bread. Spanning the kitchen in front of one of the two refrigerators was what appeared to be a metal gate approximately four feet high. No lock appeared on this refrigerator, but no pictures were taken or recording made of what, if anything, was inside it. The second refrigerator contained several gallons of milk, apples, and premade meals, and the freezer compartment contained various frozen

meals and snacks. Neither the photographs nor the video showed whether there was a lock on the second refrigerator.

¶ 72 On the stairs leading to the boys' rooms was a pile of rope. The boys' rooms were at the top of the stairs. B.W.'s room contained a dresser, various toys, two television sets, a video game system, video games, drinks, snacks, and a bed with sheets, pillows, and a comforter on it. The door to N.J.'s room did not have a doorknob and instead had a rope through where the doorknob should have been. A note on the door read: "[B.W.], Do *NOT* give [N.J.] any food or drinks! Do *NOT* let him out of the room! He has what he needs til I wake up! Do *NOT* be loud! [Love] you boogerbutt." (Emphases in original.) Inside N.J.'s room, his bed had a pillow on it but no sheets or blankets. The only other things in the room were a dresser and one toy. In the closet, which had a lock on it, there was excrement and stains that appeared to have been made by fingers. Vasquez and Martzluf agreed that the smell of urine and feces coming from the closet was "very putrid."

¶ 73 Martzluf detected a similar horrible smell of feces and urine coming from the entrance to the basement. A pile of bedding sat on the stair landing leading further into the basement. Vasquez stated that this bedding and a sectional in the basement smelled like the odor coming out of the closet in N.J.'s room. In the basement was a small windowless room that stored a variety of items and had various paint colors on the walls.

¶ 74 h. Defendant's Police Interview

¶ 75 Officer Jason Leigh interviewed defendant on March 29, 2022, parts of which were played in court. Defendant denied knowing about a rope on the door to N.J.'s room. However, he theorized that because there was no handle on the door, Jones, who he referred to as "his old lady," used the rope to (1) keep N.J. in his room when he was punished and (2) prevent him from getting

- 15 -

into the refrigerator, which had a lock on it at night.

¶ 76 Defendant also stated the boys' toys were kept in B.W.'s room because N.J. was destructive for "no apparent reason" and would throw things out the window. Defendant asserted N.J. would get into everything, such as Jones's edibles and the dog's bones. Defendant explained N.J. would eat the dog's bones, not because he was hungry, but because he liked the taste of them.

¶ 77 Defendant admitted knowing about the note on the door to N.J.'s bedroom, explaining it was there because B.W. would sneak "stuff" to N.J. all the time. Defendant insisted that he did not know why there was an issue with B.W.'s giving N.J. things while he was in his room, but he stated Jones knew why.

¶ 78 Defendant asserted that N.J. sometimes "ate like a horse" but then, after doing so, he would not eat for two or three days. Defendant said that when that happened, he would have to force N.J. to eat.

¶ 79 The last time defendant saw N.J. eat was March 28, 2022, the day before he died. N.J., who was walking around and appeared well, ate a "Hot Pocket" and drank a juice box. Defendant stated he watched a movie with N.J. on March 27, 2022, two days before N.J.'s death, and N.J. seemed fine.

¶ 80 Defendant explained that he was "never home" and sometimes did not see N.J. for two or three days because of work. However, he admitted noticing N.J. was getting "dangerously" thin. He also admitted N.J. "[could] barely walk up the stairs" but believed this was attributable to N.J.'s poor coordination. Defendant said that despite being "concern[ed]" about N.J., he did not take N.J. to the emergency room because he feared DCFS would be called. Defendant explained that in mid-March 2022, medical staff called DCFS when he took B.W., who had injured his hand, to the emergency room. (Two medical providers who had seen B.W. for his injury three times in

March 2022 testified they never called DCFS.) In the end, when asked why he did not seek immediate medical attention for N.J., defendant asserted, "I guess[ ] I did not realize how bad things were."

¶ 81                                                    i. N.J.'s Autopsy

¶ 82          On March 30, 2022, Dr. Amanda Youmans, a forensic pathologist, autopsied N.J. and confirmed Petrak's findings. Youmans found a small amount of food in N.J.'s stomach; however, there should have been much more digested food and fluids flowing through his digestive system. Because of the lack of fluids in his digestive tract, N.J. had hard stools resembling stones and a seven centimeter impacted ball of fecal material in his rectum. To Youmans, this meant that N.J. "was probably dehydrated for some time."

¶ 83          In addition, Youmans observed that all of N.J.'s fat storage was depleted, including his internal fat stores. She noted that N.J.'s internal organs had shrunk because of extreme malnutrition and his body—which was covered in "so many wounds," abrasions, scrapes, "lot[s] of scars," and bruises—had started to consume itself to survive. She confirmed that N.J. did not suffer from any underlying disease or condition, including constipation, that could have caused the emaciated and atrophied condition of his body. Youmans concluded that in her expert opinion, N.J. died from a failure to thrive due to chronic malnutrition, attributable to physical neglect and abuse. Or, in layman's terms, he was starved to death. In reaching this conclusion, she opined that N.J. was starved for "at least months."

¶ 84          The State did not call Jones to testify.

¶ 85                                                    4. *Defendant's Case*

¶ 86                              a. Defendant's Efforts To Compel Jones To Testify

¶ 87 Defendant proceeded on a theory that he (1) thought he needed guardianship to get medical care for N.J. and (2) was unaware of what Jones was doing to N.J. because his job kept him away from home. In support of that theory, defendant attempted to call Jones to testify on his behalf. Jones's attorney, who was in court, advised the trial court that Jones intended to assert her fifth amendment right not to answer questions. Defendant argued that Jones had to testify because (1) defendant was allowed to call any witness, (2) Jones's plea agreement provided that she had to testify truthfully if called, and (3) she was prohibited from appealing her guilty plea.

¶ 88 The trial court disagreed, noting that pleading guilty and appealing constituted two separate matters. Further, because Jones had not been sentenced, she still faced a loss of liberty if she testified, and her testimony could be used against her. Accordingly, the court allowed Jones to assert her fifth amendment right not to testify, and Jones subsequently did so.

¶ 89 Nonetheless, the trial court allowed defendant to question Jones outside the presence of the jury about her guilty plea. During that questioning, Jones agreed that part of her plea agreement required her to testify "against" defendant at his trial. Jones also asserted that no one ever told her she "could renege on that agreement at any time."

¶ 90                                    b. Jones's Police Interview

¶ 91 Defendant then sought to admit six excerpts of Jones's police interview. The trial court found them inadmissible based on hearsay. However, at defendant's request, the court admitted the excerpts as a proffer. In the excerpts, Jones stated the following: (1) she suffered from mental health problems; (2) all the Walkers were liars, including defendant and N.J.; (3) she could not remember some incidents with N.J.; (4) she put mittens on N.J. and wrapped them with tape around the wrists to prevent N.J. from picking at a wound above his eye and sitting on his hands after he wet his pants; (5) she never tied N.J. to the stairs and merely indicated so in a text because

- 18 -

she "was pissed off"; (6) because N.J. would "get into everything," he was put in the basement and the refrigerator was locked; (7) only she and defendant had keys to the lock, which she had ordered; (8) although she used to be a good mother, she became a bad parent after Laura kicked B.W. and N.J. out of her house, B.W. began taking his frustrations out on her, and defendant became emotionally and verbally abusive; and (9) defendant did not physically abuse B.W. and N.J., but he did emotionally and verbally abuse them.

¶ 92                                    c. Defense Witnesses

¶ 93            Several witnesses testified that (1) defendant and Jones had a rocky relationship and (2) defendant worked long hours. Regarding defendant's working long hours, Tim testified that defendant "worked all the time." Turner stated defendant would leave work around 6 or 7 p.m., frequently calling him during his commute home.

¶ 94            Winger testified defendant worked at least 8 hours a day or 60 to 70 hours per week. Winger added that defendant worked almost every Saturday and Sunday.

¶ 95            Gerald Compton, defendant's occasional coworker and best friend of 15 years, stated he knew defendant worked long hours, such as from 6 or 7 a.m. to 6 or 7 p.m. Compton explained that he knew this "[b]ecause [he] kn[e]w what type of guy [defendant was]," not because he necessarily was with defendant while he was working.

¶ 96            Wayne Perry Simmons, defendant's best friend for over 20 years, testified he worked at least four days a week with defendant before October 2021. On those days, defendant worked from 7 a.m. until 8 or 9 p.m. Sometimes, because it was so late when defendant finished work, defendant would sleep in his shop.

¶ 97                                    d. Defendant's Testimony

¶ 98            Defendant testified his relationship with Jones had been bad since around 2019.

Although the couple lived together in the same house, they did not sleep in the same bed and had little interaction because defendant worked for 12 to 15 hours every day. Despite working long hours, defendant said that he would bring food home for the family on occasion and N.J. always ate what he brought home.

¶ 99        Defendant confirmed (1) Laura had guardianship of the boys, (2) she left N.J. with defendant and Jones in July 2021, and (3) she got into an argument with Jones around August 17, 2021. A few days later, defendant left for Florida, meeting Jones, B.W., and N.J. there. The family returned around November 1, 2021, and that was when defendant attempted to obtain guardianship of the boys.

¶ 100       Around the end of January 2022, defendant noticed that N.J., who he described as "always a very good, polite, happy kid," was losing weight. He contacted DCFS, and Harvey met with the family for 1 to 1½ hours on February 22, 2022. N.J. was wearing a hoodie and was in B.W.'s room during that meeting. Defendant did not notice anything unusual about N.J.'s arms or legs, but he saw that N.J.'s face "[j]ust *** looked a little bit skinnier." Harvey was concerned about N.J.'s coloring and suggested N.J. start taking vitamins and drinking PediaSure. Defendant immediately followed this suggestion, noting he knew N.J. drank PediaSure for breakfast thereafter.

¶ 101       In the beginning of March 2022, Harvey contacted defendant about Laura signing temporary guardianship papers, which defendant believed was necessary to get N.J. medical care and enroll the boys in school. Defendant admitted that although he believed guardianship was required, he never contacted Laura or otherwise attempted to speed up the process of gaining guardianship of B.W. and N.J.

¶ 102    On the afternoon of March 27, 2022, two days before N.J.'s death, defendant watched a movie with the boys. When the movie ended, defendant and N.J. talked and had something to eat. Defendant asserted N.J. seemed fine, walking around by himself and talking normally. At around 7 or 8 p.m., N.J. walked upstairs and went to bed.

¶ 103    The next day, defendant went to work at 6 a.m. and returned home at 10:30 p.m. Everyone in the house was asleep. Defendant did not check on N.J.

¶ 104    On March 29, 2022, the day N.J. died, defendant went to work with B.W. at 6 a.m. and returned home after receiving the phone call from Jones about N.J.

¶ 105    Defendant testified there were no locks on either refrigerator in the house and he was unaware of any rope on the stairs leading to the boys' rooms. He was also unaware of any of the numerous injuries found on N.J.'s body the day he died, explaining "there's no way [he] would have allowed someone to do that" to N.J.

¶ 106    On cross-examination, defendant was shown pictures of N.J. from March 2022 that were admitted into evidence during the State's case. Defendant acknowledged that they showed N.J. was getting thinner, "look[ing] bad," and "[d]efinitely look[ing] worse." Defendant admitted to seeing and responding to the text messages Jones sent him that were admitted during the State's case, including the ones in which (1) Jones informed defendant about tying N.J.'s hands together, (2) defendant encouraged Jones to beat N.J., and (3) Jones colluded with defendant to lie to DCFS about where they were for their first meeting with Harvey in February 2022.

¶ 107                    5. *Jury Instructions*

¶ 108    The night before the jury instruction conference, the State informed the trial court it would finalize its proposed instructions and forward them to defense counsel. Defense counsel did not indicate he planned to submit any proposed instructions.

¶ 109     The next day, at the jury instruction conference, defense counsel objected to some of the State's instructions, but the trial court overruled those objections. After the court ruled on the last of the State's instructions, the court said, "That's it for [the] jury instruction conference." Defense counsel did not offer any instructions, nor did he ask for a continuance to do so.

¶ 110          6. *The Jury's Verdict and Posttrial Proceedings*

¶ 111     The jury found defendant guilty of both counts of first degree murder, one of which included a finding of "exceptionally brutal and heinous behavior."

¶ 112     Thereafter, defendant filed a posttrial motion, arguing, among other things, that the trial court erred by (1) "not giv[ing] the defense the opportunity to offer any jury instructions of any kind" and (2) allowing Jones to invoke her fifth amendment right and not testify at defendant's trial. In response, the State noted, "Defendant does not identify what additional [jury] instruction should have been given." The court denied defendant's posttrial motion.

¶ 113     The trial court sentenced defendant to 100 years in prison on count III and natural life in prison on count VI. Defendant filed a motion to reconsider his sentences, which the court later denied.

¶ 114                    II. ANALYSIS

¶ 115     Defendant appeals, arguing that (1) the trial court abused its discretion when it ruled that Jones could invoke her fifth amendment right against self-incrimination and not testify, despite her agreement to testify at defendant's trial as a condition of her guilty plea; (2) defendant's trial counsel was ineffective because he failed (a) to move for a continuance "to ensure Jones's testimony" and (b) to request jury instructions on the lesser-included offense of involuntary manslaughter; and (3) one of his convictions must be vacated under the one-act, one-crime doctrine.

¶ 116    We disagree with defendant's first two arguments but agree with his third. Accordingly, we affirm as modified.

¶ 117                    A. Jones's Plea Agreement and Expected Testimony

¶ 118    1. *The Trial Court Properly Declined To Allow Defendant To Enforce Jones's Plea Agreement*

¶ 119    Defendant argues that Jones "expressly waived her fifth amendment right by promising to testify at [defendant's] trial as a condition of her guilty plea, for which [she] also received a sentencing concession." According to defendant, "[o]nce waived, Jones could not refuse to answer defendant's questions" at his trial.

¶ 120    The State responds that defendant was not an intended beneficiary of Jones's plea agreement. Accordingly, (1) Jones could invoke her right against self-incrimination at defendant's trial when defendant attempted to call her to testify and (2) defendant could not for his benefit enforce the agreement Jones had with the State.

¶ 121    We agree with the State.

¶ 122                    a. The Applicable Law

¶ 123    " 'A plea agreement results when the [State] and the defendant exchange promises to perform or refrain from performing specified actions.' " *People v. Wells*, 2024 IL 129402, ¶ 21 (quoting *People v. Navarroli*, 121 Ill. 2d 516, 521 (1988)). As a result, plea agreements are contracts, and they are "subject to traditional principles of contract law." *People v. Henderson*, 211 Ill. 2d 90, 103 (2004); see *Puckett v. United States*, 556 U.S. 129, 137 (2009) ("[P]lea bargains are essentially contracts."); see also *Wells*, 2024 IL 129402, ¶ 21 ("[P]lea agreements are governed to some extent by contract law principles.").

¶ 124 "The basic rules of contract interpretation are well settled." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). "In construing a contract, the primary objective is to give effect to the intention of the parties," which is best determined by "look[ing] to the language of the contract itself." *Id.* Courts cannot read into a contract conditions that the plain language of the contract does not express. See *Kovilic v. City of Chicago*, 351 Ill. App. 3d 139, 146 (2004) ("[B]ecause our interpretation of the contracts must be in accordance with the plain and obvious meaning of the words used, and not through providing potentially unintended meaning to those words, we will not read such an interpretation into the contracts here.").

¶ 125 "[G]enerally, only parties or [intended] third-party beneficiaries are entitled to assert rights created by a contract." *Bank of America National Ass'n v. Bassman FBT, L.L.C.*, 2012 IL App (2d) 110729, ¶ 26. "A[n intended] third-party beneficiary is one whom the parties intended to directly benefit from the contract." *Id.* ¶ 27. "[A]n incidental third-party beneficiary is one who receives an unintended benefit from a contract." *Id.* "Only an intended third-party beneficiary may enforce rights under a contract." *Id.*

¶ 126 "A strong presumption exists that parties intend a contract to apply solely to themselves." *Id.* "That the parties expect, know, or even intend that the contract benefit others is insufficient to overcome the presumption that the contract was intended only for the parties' direct benefit." (Emphasis omitted.) *Id.* Indeed, an intention to benefit a third party "must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1020 (2009). "If a contract makes no mention of the [alleged beneficiary] or the class to which he belongs, he is not a third-party beneficiary of the contract"

and may not enforce the contract. *Id.* "The [alleged beneficiary] bears the burden of showing that the parties to the contract intended to confer a direct benefit on him." *Id.*

¶ 127    We review *de novo* the construction of a plea agreement. See *Wells*, 2024 IL 129402, ¶ 21.

¶ 128    b. This Case

¶ 129    Defendant is essentially claiming that "a term of [Jones's] plea agreement" was that she "agree[d] to testify at [defendant's] trial" under any and all circumstances. We disagree.

¶ 130    The plain language of the agreement indicated Jones agreed to plead guilty to first degree murder in exchange for various promises. None of those promises involved Jones's not invoking her right against self-incrimination if defendant called her as a witness at his trial. Instead, the agreement's terms provided Jones would testify for the State if it called her as a witness—that is, Jones agreed to testify "against" defendant if called as a State's witness.

¶ 131    Jones and the State were the only parties to this agreement. When it was made, no one addressed, or was concerned with, defendant's interests. As a result, the agreement contains no indication, or even any suggestion, that defendant was to somehow benefit from it.

¶ 132    Even if some basis existed in the record for defendant's claim that Jones and the State expected he would benefit from the agreement—a claim we specifically conclude has no merit—we note that claim alone is insufficient to overcome the strong presumption that defendant was not an intended beneficiary to the Jones's plea agreement. See *Bank of America National Ass'n*, 2012 IL App (2d) 110729, ¶ 26.

¶ 133    The recent decision of the Fourth Circuit in *United States v. Bowman*, 106 F.4th 293 (4th Cir. 2024), is persuasive and supports our conclusion that defendant cannot enforce a contract to which he is neither a party nor a beneficiary. In *Bowman*, the defendant and his

girlfriend were charged with two drug offenses. *Id.* at 297-98. The defendant opted to proceed with a trial, while the girlfriend pleaded guilty to one drug offense pursuant to a plea agreement in which she "waived her 'right to remain silent at trial.' " *Id.* at 298, 306. At his trial, the defendant called his girlfriend to testify, and she told the trial court she wanted to exercise her right against self-incrimination, which the court allowed her to do. *Id.* at 299. The defendant was found guilty. *Id.* at 300.

¶ 134    The defendant appealed, arguing that his girlfriend was required to testify at his trial because she waived her right to remain silent in her plea agreement. *Id.* at 306. The Fourth Circuit disagreed and concluded that the defendant could not enforce the agreement because he was neither a party to the agreement nor an intended beneficiary. *Id.* at 306-07. Instead, the agreement was between the girlfriend and the government, and nothing in the agreement suggested the defendant was to benefit from it. *Id.* at 307; see *United States v. Miller*, No. 1:17-cr-213, 2024 WL 4170659, at *12 (E.D. Va. Sept. 11, 2024) (the trial court followed *Bowman* and observed that even if the wife's agreement with the government waived her spousal privilege not to testify against her husband at his trial, the husband could not enforce the waiver because he was not a party to the agreement).

¶ 135    The present case is even stronger than the one in *Bowman*. In that case, the girlfriend's agreement with the government provided she "waived her 'right to remain silent at [the defendant's] trial.' " *Bowman*, 106 F.4th at 306. Here, Jones agreed to "testify *against* [defendant] truthfully if [she were] called to testify." (Emphasis added.) Thus, in contrast to *Bowman*, Jones's plea agreement expressly indicates defendant was not a beneficiary in any way to Jones's agreement with the State. Because defendant was not a party to or an intended beneficiary of Jones's agreement with the State, he could not enforce the agreement. Accordingly,

Jones could invoke her right against self-incrimination when defendant called her as a witness at his trial.

¶ 136     In support of his argument, defendant cites *People v. Accardo*, 195 Ill. App. 3d 180, 194 (1990), but that case is entirely inapposite. The *Accardo* court held that a witness *called by the State* may not invoke his right against self-incrimination on cross-examination on matters about which the witness had already testified on direct examination. *Id.*

¶ 137     The other cases defendant cites to support his claim are similarly inapposite because, in each case, the witnesses were called by the State, which was a party to the plea agreements. See, *e.g.*, *People v. Kang*, 269 Ill. App. 3d 546, 548, 550 (1995) (holding the defendant, who agreed to testify against a codefendant, was not denied his right against self-incrimination at the codefendant's trial when the State called him as a witness); *People v. Goodwin*, 148 Ill. App. 3d 56, 58, 61 (1986) (holding the defendant was properly held in contempt at the codefendant's trial for refusing to testify as a witness for the State when his plea agreement provided he would testify against the codefendant).

¶ 138     We note that the trial court properly exercised its discretion by allowing Jones to invoke her right against self-incrimination because, at the time Jones invoked her right, she had not been sentenced and her conviction was not final. See *People v. Ousley*, 235 Ill. 2d 299, 306 (2009) (a defendant "may raise the fifth amendment shield until his conviction has become final").

¶ 139     2. *Defendant Forfeited His Claim That the Trial Court Erred by Excluding Jones's Testimony Because He Failed To Make an Adequate Record*

¶ 140     In the alternative, even if we assumed the trial court erred by letting Jones invoke the fifth amendment, defendant forfeited the claim by failing to make an adequate offer of proof.

¶ 141     Both parties agree that what Jones would have testified to is unknown. Defendant

does so in an indirect way. He suggests that allowing Jones to invoke her right against self-incrimination after she allegedly waived that right pursuant to her plea agreement with the State cannot be harmless error because "[t]he evidence was not overwhelming even in the absence of Jones's testimony, and Jones *presumably* would have helped [defendant's] case." (Emphasis added.)

¶ 142 The State is far more direct, arguing that "it is unknown whether Jones['s testimony] would have been favorable to defendant." The State contends defendant "has not established that Jones could have exonerated [him] from his own failing to obtain care for N.J. and prevent N.J.'s death from starvation after undergoing months of malnutrition."

¶ 143 Because the failure to make an offer of proof makes Jones's potential testimony completely unknown, we conclude that defendant has forfeited the claim and it cannot be reviewed.

¶ 144                                    a. The Applicable Law

¶ 145 "[A] witness called by a defendant in a criminal case has the constitutional right to refuse to answer questions which tend to incriminate him." *People v. Loya*, 90 Ill. App. 3d 1078, 1087 (1980). When a witness invokes the right against self-incrimination, the defendant should, among other things, "present an offer of proof as to the questions he would have asked and the relevant information he would have elicited" from the witness. *Id.*

¶ 146 Such "[a]n offer of proof must be considerably detailed and specific [citation], and one that merely summarizes the witness'[s] testimony in a conclusory manner is inadequate." (Internal quotation marks omitted.) *People v. Way*, 2017 IL 120023, ¶ 33. However, "[t]he offer need not be a formal elicitation of the witness's testimony under oath but may be informal and consist of counsel's representations regarding the contents of the testimony." (Internal quotation marks omitted.) *Id.*

¶ 147          Offers of proof are important because they " 'inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced.' " *Id.* (quoting *People v. Peeples*, 155 Ill. 2d 422, 457 (1993)). "This enables a reviewing court to determine whether exclusion of the evidence was proper." *Id.*

¶ 148                                    b. This Case

¶ 149          When the trial court allowed Jones to assert her right against self-incrimination at defendant's trial, defendant did not make an offer of proof as to what Jones's testimony would have been. Without an adequate offer of proof, we have no way of knowing whether the exclusion of Jones's testimony helped or hindered defendant's case. A court of review cannot reverse based upon sustained objections to evidence sought to be admitted when the reviewing court has no idea what that evidence was going to be. See *People v. Wesley*, 18 Ill. 2d 138, 152 (1959) (without an offer of proof, the supreme court could not assess the propriety of the trial court's ruling); see also *People v. Staake*, 2017 IL 121755, ¶ 51 ("[A] defendant's failure to make *** an offer [of proof] results in forfeiture of the issue."). Accordingly, even if we were to conclude that Jones could not invoke her right against self-incrimination at defendant's trial, we cannot reverse the trial court's decision to exclude her testimony because defendant failed to present an adequate record.

¶ 150          In his briefs, defendant points to the excerpts from Jones's interview with the police to show what her testimony would have been, and he notes that "[t]he trial court granted defense counsel's request to admit clips of this interview for purposes of appeal, meaning that the record on appeal contains an indication of Jones's potential testimony." However, defense counsel offered these excerpts as an offer of proof when the trial court denied his request to admit the video of Jones's police interview. That is, counsel was making an offer of proof for the video itself, not as a substitute for Jones's testimony. And defendant asks us to consider the excerpts only in the

context of determining whether Jones's failure to testify constituted harmless error. We conclude that this additional context further supports our conclusion that defendant failed to make an adequate offer of proof, and we decline to overlook his forfeiture by treating the excerpts as a *post hoc* offer of proof.

¶ 151                                    3. *Conclusion*

¶ 152        In sum, because (1) the terms of the plea agreement did not provide that Jones waived her right against self-incrimination if defendant called her as a witness at his trial and (2) defendant could not enforce the plea agreement because he was not a party to or an intended beneficiary of it, the trial court correctly allowed Jones to invoke her fifth amendment right not to testify when called by defendant at his trial.

¶ 153        Alternatively, even if the trial court erred by allowing Jones to invoke her right against self-incrimination at defendant's trial, we conclude that defendant's failure to make an adequate offer of proof at trial prevents us from considering whether Jones's testimony would have helped his case.

¶ 154        Given our conclusion, we need not consider defendant's alternative argument that defense counsel was ineffective for failing to secure Jones's testimony. See *People v. Simms*, 192 Ill. 2d 348, 370 (2000) (stating trial counsel cannot be ineffective when the conduct forming the basis of the claim is not error). Nonetheless, we note that defendant's assertion that had defense counsel obtained a trial continuance "to ensure Jones's testimony [would be available]," what Jones would have testified to is entirely speculative. Nothing in the record supports that claim.

¶ 155        B. Ineffective Assistance for Not Submitting an Involuntary Manslaughter

Instruction

¶ 156        Defendant argues that he received ineffective assistance of counsel when his attorney failed to request a lesser-included offense instruction on involuntary manslaughter. Specifically, defendant contends that his counsel operated under a mistake of law when he chose an "all-or-nothing" strategy because he incorrectly believed that Laura's guardianship trumped defendant's parental rights, relieving defendant of a legal duty of care toward N.J. Defendant further argues that nothing in the record shows that defendant told his counsel *not* to submit a lesser-included involuntary manslaughter instruction. Defendant contends that, because the evidence could have led the jury to conclude that defendant acted recklessly by consciously disregarding an unjustifiable risk to N.J., and the evidence of his guilt was not overwhelming, counsel's failure prevented defendant from being convicted of involuntary manslaughter instead of first degree murder.

¶ 157        The State argues that this court cannot review the issue defendant raises because the record does not indicate defendant wanted the jury to be instructed on involuntary manslaughter. That aside, the State contends defendant failed to establish he was (1) entitled to an involuntary manslaughter instruction and (2) prejudiced when no involuntary manslaughter instruction was given.

¶ 158        We agree with the State.


¶ 159                           1. *The Applicable Law*

¶ 160        Ineffective assistance of counsel claims are governed by the familiar two-prong test delineated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Dillard*, 2025 IL App (4th) 230739, ¶ 87. Under *Strickland*, a defendant who alleges that his counsel was ineffective must establish that counsel's legal representation (1) "fell below an objective standard of reasonableness

under prevailing professional norms, such that [counsel] was not functioning as the counsel guaranteed by the sixth amendment (U.S. Const., amend. VI)" and (2) prejudiced the defendant "by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors." *People v. Haynes*, 2024 IL 129795, ¶ 23. "A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness." *Id.*

¶ 161　　　　A defendant is entitled to reasonable, not perfect, representation. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. In recognition of the variety of factors that go into determinations of trial strategy, claims of ineffective assistance of counsel must be judged on a circumstance-specific basis viewed at the time of counsel's conduct, not in hindsight. *Id.* "Whether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*." *Haynes*, 2024 IL 129795, ¶ 23.

¶ 162　　　　"[A] defendant is entitled to a jury instruction on a lesser-included offense [if] there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense ***." (Emphasis in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. "[I]t should also be [the] defendant's decision to submit an instruction on a lesser charge at the conclusion of the evidence." *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994). The failure to permit a defendant to make that decision constitutes reversible error. *Id.* at 229-30. In contrast, "where a defendant has made the decision whether to give a lesser included offense instruction, that decision is considered to be one of trial strategy, which has no bearing on the competency of counsel." *People v. Moore*, 358 Ill. App. 3d 683, 689 (2005). "Thus, that decision cannot form the basis of an ineffective assistance of counsel claim." *Id.*

¶ 163　　　　　　　　　　　　　　　2. *This Case*

¶ 164       Here, although counsel did not submit an involuntary manslaughter instruction, nothing in the record indicates who made the decision not to seek such an instruction. Without evidence, we are left to speculate whether defendant decided to pursue an involuntary manslaughter instruction or chose not to do so. Generally, an appellate court cannot review a claim that counsel was ineffective for failing to tender a lesser-included offense instruction when the record contains nothing to review regarding the reasons for that decision. See *People v. Evans*, 369 Ill. App. 3d 366, 383 (2006), *abrogated on other grounds by People v. Veach*, 2017 IL 120649, ¶ 48; see also *Moore*, 358 Ill. App. 3d at 689-90 ("[T]he record contains no information to indicate whether defendant was given the opportunity to make that decision [about submitting a lesser-included offense instruction]. Without this information, we cannot adjudicate defendant's claim.").

¶ 165       However, even if defendant told counsel to request an involuntary manslaughter instruction and counsel refused, the record establishes that defendant was not (1) entitled to an involuntary manslaughter instruction or (2) prejudiced by the failure to give the jury an involuntary manslaughter instruction.

¶ 166       The primary difference between involuntary manslaughter and first degree murder is the mental state accompanying the conduct resulting in the victim's death. *McDonald*, 2016 IL 118882, ¶¶ 50-51. "For first degree murder, the defendant knows his acts 'create a strong probability of death or great bodily harm.' " *People v. Jackson*, 372 Ill. App. 3d 605, 613 (2007) (quoting 720 ILCS 5/9-1(a)(2) (West 2000)). A person commits involuntary manslaughter when he "performs acts 'likely to cause death or great bodily harm' and he performs those acts 'recklessly.' " *Id.* (quoting 720 ILCS 5/9-3(a) (West 2000)).

¶ 167       We conclude that the overwhelming evidence presented at trial demonstrated that defendant knew his acts, together with those of Jones, created a strong probability of death or great

bodily harm to N.J. Specifically, despite working long hours, defendant was home with N.J. the last two days he was alive and saw N.J. getting dangerously thin and losing motor skills in the time leading up to his death. Yet, defendant refused to seek medical care for him, whether by (1) asking Laura, who had guardianship, to do so or (2) taking N.J. to the doctor on his own, as defendant did with B.W. four times in the weeks leading up to N.J.'s death. In fact, defendant lied to Winger about N.J. getting medical care when Winger brought concerns about N.J.'s appearance to defendant's attention.

¶ 168        In addition, defendant (1) allowed N.J. to be secured in his room to prevent him from getting into the refrigerator, (2) never removed the note on N.J.'s door warning B.W. not to give N.J. food, (3) was angered by and reprimanded B.W. for helping N.J., (4) never used his key to unlock the refrigerator for N.J. so that he could get something to eat, (5) told Jones to lock the refrigerator, (6) approved of Jones not feeding N.J., and (7) encouraged Jones to beat N.J. and deny him food.

¶ 169        We conclude that even if the jury had been instructed on involuntary manslaughter, no reasonable probability exists that the jury would have convicted him of that offense instead of first degree murder, given the overwhelming nature of the evidence that defendant acted knowingly rather than recklessly. See *Haynes*, 2024 IL 129795, ¶ 23 (holding a defendant cannot establish counsel was ineffective if he fails to establish he was prejudiced by counsel's conduct, as both prongs of *Strickland* must be satisfied).

¶ 170        C. Vacation of Count III Pursuant to the One-Act, One-Crime Doctrine

¶ 171        Last, defendant argues that his conviction of count III must be vacated under the one-act, one-crime doctrine. Defendant acknowledges that he failed to preserve the issue for

review by not raising it in the trial court. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, he asks us to review this issue as second-prong plain error.

¶ 172    The State concedes error.

¶ 173    We accept the State's concession and conclude that defendant's conviction and sentence for count III must be vacated under the one-act, one-crime doctrine.

¶ 174                                  1. *The Law*

¶ 175    Under the plain error doctrine, a reviewing court can consider unpreserved error:

"(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Coats*, 2018 IL 121926, ¶ 9.

The supreme court has repeatedly concluded "that one-act, one-crime violations fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process." *Id.* ¶ 10.

¶ 176    Under the one-act, one-crime doctrine, multiple convictions may not be based on the same physical act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010); *People v. King*, 66 Ill. 2d 551, 566 (1977). In the context of murder convictions, "[w]here but one person has been murdered, there can be but one conviction of murder." *People v. Cardona*, 158 Ill. 2d 403, 411 (1994). "Under such circumstances only the conviction for the most serious charge of murder will be upheld, and

the convictions on the less serious charges of murder are to be vacated," leaving the sentence imposed on the most serious murder conviction intact. *Id.*

¶ 177 "The offense that carries the greater punishment is considered the more serious offense." *In re T.R.*, 2019 IL App (4th) 190529, ¶ 158. A defendant convicted of first degree murder faces a prison term between 20 and 60 years. 730 ILCS 5/5-4.5-20(a) (West 2022). If an extended term is imposed, the defendant faces a sentence between 60 and 100 years. *Id.* However, a sentence of natural life imprisonment may be imposed when the "trier of fact finds beyond a reasonable doubt that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." *Id.* § 5-8-1(a)(1)(b); see *id.* § 5-4.5-20(a).

¶ 178 Whether a one-act, one-crime violation arose is a question of law that we review *de novo*. *People v. Almond*, 2015 IL 113817, ¶ 47.

¶ 179                              2. *This Case*

¶ 180 Here, defendant was convicted of two counts of first degree murder, both involving the same victim, N.J. Because defendant faced (and was given) a greater sentence on the conviction for count VI, which charged that N.J.'s "death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty," we uphold his conviction and sentence for count VI and vacate his conviction and sentence on count III, the less serious first degree murder count.

¶ 181 In all other respects, we affirm the trial court.

¶ 182                              III. CONCLUSION

¶ 183 For the reasons stated, we affirm as modified the trial court's judgment.

¶ 184 Affirmed as modified.

*People v. Walker*, 2025 IL App (4th) 241013

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 22-CF-231; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Anthony J. Santella, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |